In the ESTATE OF CATES, Clyde E., Deceased, Arla Randol, Personal Representative, Respondent,

v.

Jesse L. BROWN, Deceased, Lois A. Fritze, Personal Representative, Appellant.

Nos. WD 54371, WD 54551.

Missouri Court of Appeals, Western District.

Submitted March 4, 1998.

Decided July 28, 1998.

---

Elvin S. Douglas, Jr., Harrisonville, for appellant.

Kevin K. Anderson, Harrisonville, for respondent.

Before EDWIN H. SMITH, P.J., and SMART and ELLIS, JJ.

PER CURIAM.

The trial court granted summary judgment in favor of the estate of Clyde E. Cates on a

claim made by Jesse L. Brown, that the estate owed him $44,638.00 for personal services performed over a period of ten years, from 1952 through 1962. The appellant contends that the trial court erred by granting the estate's motion for summary judgment because Mr. Brown's claim was timely filed and states a cause of action for an oral agreement to make a will in favor of Mr. Brown. The appellant also claims that the respondent's motion for summary judgment was not in proper form and should not have been considered by the trial court. The judgment of the trial court is affirmed.

The appellant's decedent, Jesse Brown, died after the trial court's judgment was entered. Lois Fritze, personal representative, has been substituted as a party. The factual background of this case begins over 50 years ago. Jesse Brown first met Clyde Cates and his wife, Oddiece Cates, in 1946 when Mr. Brown was thirteen or fourteen years old. The Cateses lived five miles south of Harrisonville, Missouri. Mr. Brown lived nearby. He moved to Harrisonville and went to work first for a dairy and then for a greenhouse, making $5.00 per day. In 1952, Mr. Brown was unemployed. He met Mr. Cates, who told Mr. Brown that he had suffered a heart attack and could not work. Oddiece Cates was also sick and could not do much work. Mr. Cates asked Mr. Brown to come to work for him and help with his farm. In return, Mr. Cates agreed to furnish Mr. Brown room and board. He explained to Mr. Brown that he could not pay him anything at that time but that he would make it up to him once he got on his feet.

Mr. Brown started working for Mr. Cates on July 20, 1952. Mr. Brown's duties included milking eight cows, feeding chickens, working in the field, mowing pastures and mowing hay. Mr. Brown worked for Mr. and Mrs. Cates until July 20, 1955. He left because, although the Cateses seemed to be back on their feet, the Cateses had not offered to pay any salary. In August 1955, the Cateses found Mr. Brown in Augusta, Kansas, working at a gas station for 80 cents per hour. They begged Mr. Brown to return to the farm. Mr. Brown agreed to return to the farm. He did this, he later said, because he felt sorry for the Cateses. At the farm, he was given increased chores. He was provided room and board. Mr. Cates promised to pay Mr. Brown one dollar per day, but paid him for only two weeks. In the spring of 1956, Mr. Cates gave Mr. Brown five acres of crops. At this time, Mr. Brown was doing all of the labor on the Cateses 150–acre farm.

In the summer of 1956, the Cateses decided to go on vacation to New Mexico. Before they left, they went to Harrisonville. Upon their return, they told Mr. Brown that they had seen an attorney at the law firm of Crouch, Crouch & Spangler and made a will. Mr. Brown was told that when "anything happened" to the Cateses "everything" would be his. After that, compensation was not discussed, and the couple told him that everything would be his and not to worry about it. When Mr. Brown would get disgusted, he was told that everything was to be his.

In the fall of 1956, Mr. Brown made $400.00 on the five acres of crops that he had been given in the spring. He decided that this was not much money for two years of work, so in December 1956 he went to California. He did not tell the Cateses he was leaving, nor did he leave a note. Mr. Brown found employment at a laboratory at $2.00 per hour. The Cateses found him and started telephoning him, begging him to return. Mr. Brown returned to work for the couple on June 17, 1957. Once again, Mr. Brown did most of the work on the farm. He was given room and board. According to Mr. Brown at that time it was a common arrangement for laborers to receive their room and board in exchange for services. Mr. Cates gave Mr. Brown ten acres of crops, which Mr. Cates had planted in the spring, but Mr. Brown had to pay "grain rent," which reduced the net yield of the crops. Mr. Cates helped Mr. Brown plant crops on 20 acres belonging to Mr. Brown in the spring of 1958. In 1959, Mr. Brown "made better" on the crops, but Mr. Brown still felt he was not being fully compensated. Both Mr. and Mrs. Cates kept reminding Mr.

Brown that everything they had was to be his. During this period, Mr. Cates increased the size of his farmland. Mr. Brown continued to do almost all of the work with some help from Mr. Cates. Mr. Cates did not hire any additional labor.

In 1961, Mr. Cates was given a 120–acre farm east of Garden City, Missouri. Mr. Brown helped the Cateses move to the farm. He assisted in rebuilding the house on the property. He was never paid. The Cateses did not allow Mr. Brown to live with them, so he rented a house and six acres of land. Mr. Brown began working off his rented farm for his own living. Although he would help out now and then, Mr. Brown did not regularly work for the Cateses again. He continued to help the Cateses three or four times a week until his marriage in 1968.

On July 3, 1968, Mr. Brown got married. The Cateses were unhappy with this development. The Cateses refused to have anything to do with Mr. Brown or his wife. Mr. Brown said that when he told Mr. Cates that he was going to get married, Cates said, "he would tear the will up if I got married, and I said, well, if his word wasn't any better, it wasn't no good, then the paper wasn't worth a darn, either." Mr. Brown had never seen a will. He believed that Mr. Cates was serious about his intention to tear up the will.

Mr. Brown did not see Mr. Cates for many years. He moved to Pleasant Hill and then to Wheatland. In 1990, Mr. Cates came to visit Mr. Brown. He told Mr. Brown that Oddiece had passed away. Mr. Cates told Mr. Brown that he was "just like a long lost son" and was "still in his will." Several other people heard Mr. Cates tell Mr. Brown that the will was "still in effect." Mr. Cates died on February 11, 1992. Mr. Brown found two wills; a 1977 will made out in favor of Harold and May Roberts and a 1988 will made out in favor of Arla Randol. No will was ever found naming Mr. Brown as a beneficiary. Mr. Brown checked with all of the lawyers in Harrisonville, and found no evidence of any other will having been drafted.

Arla Randol was issued letters testamentary as personal representative of Mr. Cates'

estate on September 14, 1992. On January 28, 1993, Mr. Brown filed a *pro se* claim against the estate of Clyde Cates. He alleged that the estate owed him $44,638.00 for services rendered over a period of ten years, from 1952 until 1962. The estate filed a motion for summary judgment on May 3, 1993. This motion was denied on June 28, 1993. A second motion for summary judgment was filed by the estate on April 11, 1996. After argument, the trial court granted the motion on December 17, 1996, without giving its basis for doing so. Mr. Brown died on December 30, 1996. The trial court granted a motion for substitution of a party claimant made by the personal representative of Mr. Brown's estate, Lois A. Fritze.

## SUMMARY JUDGMENT

The trial court's grant of summary judgment is reviewed *de novo*. *Adams Ford Belton, Inc. v. Missouri Motor Vehicle Comm'n*, 946 S.W.2d 199, 202 (Mo. banc 1997). We view the record on appeal in the light most favorable to the party against whom the judgment was entered. *Premium Standard Farms, Inc. v. Lincoln Township of Putnam County*, 946 S.W.2d 234, 237 (Mo. banc 1997). The moving party bears the burden of establishing its entitlement on the record to judgment as a matter of law. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 382 (Mo. banc 1993). Evidence in the record that presents a genuine issue of material fact defeats a movant's right to summary judgment. *Id.* A genuine issue "implies that the issue, or dispute, must be a real and substantial one—one consisting not merely of conjecture, theory and possibilities." *Id.* at 378. In other words, the dispute must not be merely argumentative, frivolous or imaginary. *Id.* at 382. If the trial court's grant of summary judgment can be sustained on any theory as a matter of law, we will not set it aside on review. *City of Washington v. Warren County*, 899 S.W.2d 863, 868 (Mo. banc 1995). "The theory need not be one raised or argued by either party and may be raised *sua sponte* by the appellate court, provided

the court incorporates principles raised in the petitions." *Id.*

## STATUTE OF LIMITATIONS

In Point I, the appellant contends that the trial court erred in granting the respondent's motion for summary judgment because Mr. Brown's claim stated a cause of action for an oral agreement to make a will. The appellant claims that the cause of action accrued at the time of Mr. Cates' death and was therefore timely filed. The respondent contends that the motion for summary judgment was properly granted because, as a matter of law, no contract to make a will existed. The respondent argues that Mr. Cates made the alleged will before Mr. Brown knew of his intent and there was never any agreement to make a will in return for Mr. Brown's services. The respondent argues that because the services provided by Mr. Brown were rendered more than thirty years before the claim was made, the action is time barred under § 516.120, RSMo 1994.[1]

1. All statutory references are to Revised Statutes of Missouri 1994, unless otherwise indicated.

2. Section 516.120 provides:

Within five years:
(1) All actions upon contracts, obligations or liabilities, express or implied, except those mentioned in section 516.110, and except upon judgments or decrees of a court of record, and except where a different time is herein limited;
(2) An action upon a liability created by a statute other than a penalty or forfeiture;
(3) An action for trespass on real estate;
(4) An action for taking, detaining or injuring any goods or chattels, including actions for the recovery of specific personal property, or for any other injury to the person or rights of another, not arising on contract and not herein otherwise enumerated;
(5) An action for relief on the ground of fraud, the cause of action in such case to be deemed not to have accrued until the discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud.

3. An action sounding in quantum meruit is based upon a person's implied promise of reasonable and just compensation in return for the performance of valuable services, performed at that person's behest or with his approval. *Reid v. Reid*, 906 S.W.2d 740, 743 (Mo.App.1995). "Quantum meruit is a remedy for the enforcement of a quasi-contractual obligation and is generally based upon the principle of unjust enrichment." *Forry v. Department of Natural Resources*, 889 S.W.2d 838, 847 (Mo.App.1994).

Section 516.120[2] mandates a five-year limitation period on actions brought under a theory of quantum meruit.[3] If Mr. Brown is proceeding solely upon quantum meruit, he is clearly foreclosed by the applicable statute of limitations from prosecuting his claim against Mr. Cates' estate.

Appellant claims, however, that quantum meruit is not the theory upon which it premises its recovery. Appellant contends that there was a valid oral agreement between Mr. Cates and Mr. Brown for Mr. Cates to make a will in Mr. Brown's favor in return for the service Mr. Brown provided to the Cateses on their farm. The appellant argues that the claim did not accrue until the time of Mr. Brown's death, and thus, his claim against the estate was timely filed and not barred by the statute of limitations.[4]

### Contract To Make A Will

[1, 2]  We need not decide the question of when Mr. Brown's cause of action accrued

Unjust enrichment is said to occur where a benefit is conferred upon a party under conditions that a party's retention of the benefit without paying for it would be unjust. *River's Bend Red–E–Mix, Inc. v. Parade Park Homes, Inc.*, 919 S.W.2d 1, 4 (Mo.App.1996).

4. There is some disagreement as to when the cause of action could be said to have accrued. Basically, there are two approaches taken by other jurisdictions on questions concerning oral contracts to make a will in return for services. One approach is to find that the cause of action on an oral contract to make a will accrues at the death of the individual making the promise. This approach is premised on the idea that no breach has occurred until the defendant dies because he may, to the very last minute of his life, carry out his expressed intention. The other approach starts the statute of limitations running from the date of a clear and unequivocal repudiation of the contract. *See generally* H.A. Wood, Annotation, *Remedies During Promisor's Lifetime on Contract to Convey or Will Property at Death in Consideration of Support or Services*, 7 A.L.R.2d 1166 (1949); P.A. Agabin, Annotation, *Statute of Limitations Applicable in Action to Enforce, or Recover Damages for Breach of Contract to Make a Will*, 94 A.L.R.2d 810 (1964).

Section 516.100 provides "that for the purposes of sections 516.100 to 516.370, the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment...." The phrase "capable of ascer-

and whether his suit fell within the limitations period because this appeal may be resolved on other grounds related to the adequacy of the evidentiary record. A contract to make a will must be proven by clear, cogent and convincing evidence. *Osborn v. Boatmen's National Bank of St. Louis,* 811 S.W.2d 431, 435 (Mo.App.1991). Where a party claims that an oral contract to make a testamentary disposition of property exists, there are eight elements that must be proven:

(1) that the contract is definite;

(2) that the contract is proven as pleaded;

(3) that the contract has been established by recent, definite conversations;

(4) that the contract is fair;

(5) that proof of the contract shows clearly and convincingly[5] that the contract had been made and that there was full performance of the contract (as was possible);

(6) that performance was referable solely to the contract

(7) that there was adequate consideration for the contract; and

(8) that a real contract to devise is shown, not just proof of the mere disposition to devise.

*Id. (citing Walker v. Bohannan,* 243 Mo. 119, 147 S.W. 1024, 1028–29 (1912)).

Prior to 1956, there was no mention of any will, or of any intention to provide for Mr. Brown at the Cateses' deaths. Mr. Brown began working for the Cateses in 1952. The parties agreed that Mr. Brown would work for room and board. Mr. Cates told Mr. Brown that he would "make it up" when he got "back on his feet." After Mr. Brown left the farm, he returned, agreeing to work for the Cateses for room and board in addition to $1.00 per day. Mr. Cates paid Mr. Brown for only two weeks. Mr. Brown acknowledged that Mr. Cates made no other promises or assurances that he would be paid in addition to his room and board. He also acknowledged that the arrangement he had made with the Cateses was common for farm laborers at that time.

▆▆ In 1956, four years after Mr. Brown had begun working for them, the Cateses told Mr. Brown they had gone to the offices of the Crouch law firm in Harrisonville and made a will.[6] They told Mr. Brown that, under the will, when they died, everything would be his. However, there is no evidence that the Cateses offered to make

---

tainment" has never been given a precise definition. *O'Reilly v. Dock,* 929 S.W.2d 297, 300 (Mo.App.1996). It refers to the fact of damage, rather than to the exact amount of damage. *Nuspl v. Missouri Medical Ins. Co.,* 842 S.W.2d 920, 922 (Mo.App.1992). It has been construed to mean "the moment that plaintiff's damages are substantially complete." *Lockett v. Owens–Corning Fiberglas,* 808 S.W.2d 902, 907 (Mo.App. 1991). A compelling argument could be made that had there been a contract between the parties, Mr. Brown's damages were capable of ascertainment when Mr. Cates told him that he was going to tear up the will.

Missouri law does allow for suits to enforce such contracts during the promisor's lifetime under certain circumstances. In *Jesse v. O'Neal,* 364 Mo. 333, 261 S.W.2d 88 (1953), the court announced the rule in such cases, stating, "relief in the nature of or analogous to specific performance (i.e., protective relief) will not be granted during the promisor's lifetime and before full performance by the promisee, except where the facts establish a situation imperatively calling for protective equitable relief; and in a proper case such relief will not be denied simply because the promisor is alive and the promisee has not fully performed." *Id.* at 91. However, authority also

exists to support the position that the statute of limitations does not start to run until the promisor's death. *See Reighley v. Fabricius' Estate,* 332 S.W.2d 76, 87 (Mo.App.1960). In *Reighley,* however, the promisor did nothing during her lifetime to indicate that she was not going to remember the promisee in her will. Moreover, there was evidence in *Reighley* that the promisee rendered services to the promisor specifically based on the promise that the promisor would pay for these services in her will. *Id.* at 79–80.

**5.** The fifth element formerly required proof beyond a reasonable doubt. *See Walker v. Bohannan,* 243 Mo. 119, 147 S.W. 1024, 1028–29 (1912). However, *Osborn,* 811 S.W.2d at 435, acknowledged a change in the level of proof, applying the rule of *In the Matter of Passman,* 537 S.W.2d 380, 381 (Mo. banc 1976). Therefore, we have substituted the words "shows clearly and convincingly" in our description of the fifth element.

**6.** There is no documentary evidence that any such will (naming Mr. Brown) was ever prepared at the Crouch law firm or any other law firm.

such a will in exchange for Mr. Brown's agreement to provide future services or as payment for past services. Rather, this gesture is presented in the evidence as a unilateral gesture on the part of the Cateses. It is not clear exactly what the Cateses had in mind as far as their future expectations of Mr. Brown. Nor was there any express or implied promise not to revoke the will. There were no negotiations, and no offer calling for acceptance. "If there is no offer, it is impossible to find clear, cogent and convincing evidence that a contract existed." *See Estate of Munzert,* 887 S.W.2d 764, 768 (Mo.App.1994). The evidence shows only a unilateral intent on the part of the Cateses to reward Mr. Brown for his devotion to them. Mr. Cates' later representations between 1990 and 1992 that Mr. Brown was in the will do not constitute a contract to make a will.[7] The statements may be evidence of an intention to benefit Mr. Brown, but do not prove by clear, cogent, and convincing evidence the establishment of a contract.

It is true that, at several times after 1956, the Cateses asked Mr. Brown to continue working for them, and they implied that if he did so they would not revoke the will. They reminded him several times that he was still in their will. However, no "definite" agreement in this regard was ever shown. The terms were never spelled out. Moreover, the Cateses, from time to time, found other ways to compensate Mr. Brown in addition to providing room and board. Thus, not all of the services were necessarily referable to the contract to make a will.

We conclude that Mr. Brown could not make a submissible case under a standard requiring proof by "clear, cogent, and convincing evidence." The latter standard is, of course, more stringent then proof by a preponderance of the evidence. *Estate of Munzert,* 887 S.W.2d at 768. Mr. Brown's affidavit and deposition constitute the only evidence of an agreement, and his statements concerning whether such an agreement actually was adopted by the parties were equivocal. It cannot be said to be *clear* that there was such an agreement. Since Mr. Brown is now deceased, and there are no other witnesses to any agreement between the parties, there could be no point in remanding to allow plaintiff an additional opportunity to present evidence. A jury would have no opportunity to hear anything different from the facts reflected in the record already before us. We hold that the trial court did not err in granting summary judgment because we conclude that, as a matter of law, plaintiff cannot make a submissible case.

## RULE 74.04(c)(1)

In Point II, the appellant contends that the trial court erred in granting the respondent's motion for summary judgment because the motion was not in proper form as it did not comply with Rule 74.04(c)(1), which provides:

> Motions for summary judgment shall state with particularity in separately numbered paragraphs each material fact as to which the movant claims there is no genuine issue, with specific references to the pleadings, discovery or affidavits that demonstrate the lack of a genuine issue as to such facts. Each motion for summary judgment shall have attached thereto a separate legal memorandum explaining why summary judgment should be granted and affidavits not previously filed that are relied on in the motion.

The purpose of the particularity requirement of Rule 74.04(c) is to inform the

---

7. Nor can Mr. Cates' remarks be interpreted to somehow create a new contract to make a will. Section 474.155 establishes the current requirements for contracts to make wills. It states, in pertinent part:

A contract to make a will or devise, to revoke or not to revoke a will or devise, or to die intestate, if executed after January 1, 1981, can be established only by

(1) Provisions of a will stating material provisions of the contract;

(2) An express reference in a will to a contract and extrinsic evidence proving the terms of the contract; or

(3) A writing signed by the decedent evidencing the contract.

opposing party, the trial court, and the appellate court of the specific basis on which the movant claims entitlement to summary judgment. *Chaney v. Cooper,* 954 S.W.2d 510, 515 (Mo.App.1997). We are authorized to review the motion on the merits, however, where the basis for the motion is obvious. *Miller v. Smith,* 921 S.W.2d 39, 43 (Mo.App. 1996).

In the instant case, the respondent's motion for summary judgment complies with Rule 74.04(c)(1) and the basis for the motion is obvious. The issues in the motion were sufficiently clear for the appellant to file appropriate responsive pleadings and are sufficiently clear for the purposes of our review. The motion was supported by excerpts from the deposition of Mr. Brown. The appellant filed a detailed response to the motion for summary judgment, with suggestions in support. There is nothing to indicate that appellant or the trial court were not clear on the issues in the case. The motion for summary judgment contains separately numbered paragraphs setting out facts alleging that there are no genuine issues of material fact to be decided. Appellant points out that there are legal conclusions set forth in the motion. Such conclusions will not, by themselves, render a motion unreviewable. Legal conclusions, without specification of factual contentions, can be disregarded when considering motions for summary judgment. *Xavier v. Bumbarner & Hubbell Anesthesiologists,* 923 S.W.2d 428, 433 (Mo.App.1996). The motion under consideration here can be read to raise a defense of the statute of limitations. It can also be read to refute Mr. Brown's claim that an oral contract to make a will existed between the parties. In any event, the key issue on review of the granting of a motion for summary judgment is whether judgment was properly granted. We have resolved that issue in favor of respondent. Point is denied.

## CONCLUSION

Although Mr. Brown may at one time have had a claim on some theory other than an oral contract to make a will, we hold that the trial court did not err in granting the respondent's motion for summary judgment, because appellant cannot prove by clear, cogent, and convincing evidence that there was a valid agreement between the Cateses and Mr. Brown for the Cateses to make a will in favor of Mr. Brown in return for Mr. Brown's services.

The judgment is affirmed. Each party shall bear its own costs on this appeal.